## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF

**Jordan Amiere HULING;**

**1283 Nome Avenue, Akron, Ohio 44320**

Case No. ___5:23MJ1270-AMK/5:23MJ1271-AMK___

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, JOHN S. CHRISTIE JR., Task Force Officer (TFO) of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, being duly sworn under oath, hereby depose and state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a law enforcement officer of the United States, and under 18 U.S.C. § 3051.  I am empowered by the Attorney General to conduct investigations, enforce criminal, seizure, and forfeiture provisions of the laws of the United States, carry firearms, serve warrants and subpoenas issued under the authority of the United States, make arrests without a warrant for any offense against the United States committed in my presence, and make arrests for a felony offense under the laws of the United States if there are reasonable grounds to believe that the person to be arrested has committed or is committing such a felony.

2.      I have been employed by the Ohio Adult Parole Authority (APA) as a Parole Officer since March of 2016. Since May of 2017, I have been serving as a TFO with the ATF.  I am presently assigned to the APA's Akron Region and to ATF's Cleveland Field Office.

1

3.      I am a graduate of New Employee Orientation at the State of Ohio Department of Rehabilitation and Corrections Training Academy, located in Orient, Ohio, as well as Basic Probation Officer Training, through the Georgia Department of Corrections in Forsyth, Georgia. During these training academies, I learned about the supervision of felony offenders as well as conducting investigations, interviews, execution of arrest warrants, and criminal procedure.

4.      I was previously employed as a Probation Officer with the Georgia Department of Corrections from September of 2011 to May of 2015. During that time, I both led and assisted with numerous drug and gang investigations that involved identifying criminal activity, application of various investigative techniques, conducting searches, as well as obtaining and executing arrest warrants.

5.      I received a Bachelor's Degree in Sociology with a concentration in Criminal Justice from St. John Fisher College in Rochester, NY.  I have completed numerous specialized training courses through organizations such as the Atlanta – Carolinas High Intensity Drug Trafficking Area (HIDTA) and the Georgia Public Safety Training Center, including courses on interviews and interrogations, search warrants and affidavits, gang investigations, advanced gang investigation and prosecution techniques, cyber-crime investigations, financial crime investigations, and money laundering investigations. I have also completed an ATF Joint Law Enforcement Operations (JLEO) TFO program in Washington DC, which included training on federal firearms laws and firearms identification. In addition to these courses, I have been trained and certified as a semi-automatic pistol instructor and a Glock pistol armorer.

6.      As an ATF Task Force Officer, I have conducted and/or assisted in numerous investigations involving the possession, distribution, and trafficking of controlled

substances, in violation of State and Federal laws. These drug investigations have involved searching persons, electronic devices, social media, residences, and vehicles, for contraband, using both search warrants and consent waivers. During these searches, I have gained experience in identifying controlled substances. I have also gained experience with other contraband commonly associated with illegal drug activity including, cutting agents, narcotics packaging material, drug paraphernalia, counterfeit currency, and other items used in the sale and distribution of controlled substances. I have also gained knowledge that those involved in the distribution of narcotics often utilize electronic devices, such as cellular phones, and social media websites/applications to communicate with their customers and suppliers.

7.      As an ATF Task Force Officer, I have conducted and/or assisted in numerous investigations involving the possession and trafficking of firearms in violation of State and Federal laws, as well as the use of firearms in furtherance of other criminal offenses.  In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not limited to surveillance, confidential informants, controlled purchases, trash pulls, social media research, electronic databases and interviews. During these investigations, I have learned that firearms are often acquired through third parties, due to the subjects of investigation being prohibited from legally purchasing firearms. Like drug distribution and trafficking, individuals engaged in illegal firearms trafficking utilize electronic devices, such as cellular phones, and social media websites/applications to communicate with their customers and suppliers.

8.      The facts contained in this Affidavit are based upon my personal knowledge of the investigation, in addition to general knowledge, training, and experience, and the observations, knowledge, training, and experience of other officers and agents. All

3

observations referenced below that were not personally made by me, were relayed to me by those who made such observations, either verbally or via reports written by those agents and/or officers.

9.     This Affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or law enforcement or known to the government.

## PURPOSE OF THE AFFIDAVIT

10.     ATF Cleveland Group I, in conjunction with other federal, state, and local law enforcement agency partners, has been conducting an investigation into the violation of federal firearm laws by **Jordan Amiere HULING** (hereinafter "**HULING**"), and his criminal associates. The investigation to date has focused on the following offenses:

   a.   Unlawful possession of a machinegun, in violation of 18 U.S.C. § 922(o).

   b.   Unlawful dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A).

11.     The information relayed in this Affidavit is made in support of an application filed for a search warrant to be conducted on the person of **HULING** and for an application filed for a search warrant to be conducted at **HULING**'s residence located at **1283 Nome Avenue, Akron, Ohio 44320** (hereinafter "**SUBJECT PREMISES**").

## PREMISES AND PERSON TO BE SEARCHED

12.     This application seeks authorization to search **HULING** who is further described as an 18-year-old male, approximate height: 6'02", approximate weight: 205 lbs., black hair, brown eyes, DOB: XX/XX/2004.  See **HULING** Attachment A.  **HULING** Attachment A is incorporated herein by reference. I conducted a search of a law enforcement database (NCIC) and learned **HULING** has pending felony weapon offense charges in Summit County, Ohio.

4

13.     This application seeks authorization to search the **SUBJECT PREMISES,** noted above as **1283 Nome Avenue, Akron, Ohio 44320**, which is described in more detail in **SUBJECT PREMISES** Attachment A. The **SUBJECT PREMISES** is located within the Northern District of Ohio, Eastern Division. The **SUBJECT PREMISES** Attachment A is incorporated herein by reference.

## ITEMS TO BE SEIZED

14.     A list of the specific items to be seized from **HULING** and the **SUBJECT PREMISES** is included in Attachment B. Attachment B is incorporated herein by reference. Based on my training and experience, and information relayed in this affidavit, there is probable cause to believe that the items listed in Attachment B will be found on **HULING** and in the **SUBJECT PREMISES.**

## FACTS ESTABLISHING PROBABLE CAUSE

15.     Beginning in June 2023, ATF Cleveland Group I has been investigating an armed criminal street gang operating in Akron, Ohio. During the investigation, law enforcement became aware that people associated with this criminal street gang appeared in open-source online media and on social networking platforms unlawfully possessing what appeared to be Glock pistols equipped with Machinegun Conversion Devices (MCD).

16.     An MCD is a part, or combination of parts, designed and intended for use in converting a semiautomatic Glock pistol into a machinegun. The MCD attaches to the rear of the slide on Glock pistols and when the MCD is engaged, it is capable of making the pistol fire multiple rounds of ammunition automatically with a single pull of the trigger, turning the firearm into a machine gun. Thus, these devices are classified as machine guns under the National Firearms Act and may only be lawfully possessed by a Federal Firearms Licensee (FFL) that has paid a Special Occupational Tax. Based on my training and

5

experience, I know that commonly used slang terms for MCD include "switch," "Glock switch," "glitch," and "button." Through training and experience, I am familiar with MCDs, their function, and their appearance both by themselves and when attached to a firearm.

17.     During the investigation, I located media posted to YouTube, Facebook, and Instagram depicting SUSPECT 1, unlawfully possessing what appeared to be a Glock pistol with an MCD. SUSPECT 1 is not eligible for a Federal Firearms License due to him only being 20 years old, and thus he unlawfully possessed the MCD. Through the investigation, I determined that the source of SUSPECT 1's MCD was SUSPECT 2. SUSPECT 1 and SUSPECT 2 are persons whose identity is known to law enforcement.

18.     On September 13, 2023, United States Magistrate Judge Amanda M. Knapp issued a search warrant for SUSPECT 2's cellular telephone.

19.     On September 19, 2023, ATF, Barberton Police Department, and Akron Police Department (APD) conducted an operation with the intent to execute the search warrant issued on September 13, 2023. On that date, SUSPECT 2's cellular telephone was seized and was forensically examined. A forensic image was created of the device, which provided me with a copy of data from SUSPECT 2's cellular telephone, including, but not limited to, messages, photographs, and videos stored on the device. Also on that date, in addition to the cellular telephone, multiple MCDs were seized by ATF from SUSPECT 2.

20.     On October 10, 2023, I reviewed the forensic image of SUSPECT 2's cellular telephone. During the review, I located several message strings between SUSPECT 2 and

**HULING**. I am aware that **HULING**'s nickname is "Osama."[1] I also located photographs believed to be sent by **HULING** to SUSPECT 2. **HULING** often appeared to advertise firearms, including pistols and rifles, for sale in the messages with SUSPECT 2. I located three message threads between **HULING** and SUSPECT 2 spanning from March 2023 to September 2023.

21.　　Based on the message threads, the three telephone numbers utilized by **HULING** during that time include 216-533-3829, 216-744-4594, and 216-612-6682. The contact name for telephone number 216-533-3829, was saved in SUSPECT 2's phone as "Osama." At the beginning of the 216-744-4594 message thread, **HULING** identified himself as "Osama." At the beginning of the 216-612-6682 message thread, **HULING** identified himself as "Osam."

22.　　During the review of the messages, I observed that on August 24, 2023, telephone number 216-744-4594 (**HULING**) sent SUSPECT 2 messages regarding MCDs. Listed below are some of the messages:

    a.　8/24/2023 11:19:24 AM(UTC-4) – SUSPECT 2 to **HULING**: "You got glitches" (Referring to MCDs).

    b.　8/24/2023 11:26:26 AM(UTC-4) – **HULING** to SUSPECT 2: "My dude got ah couples"

    c.　8/24/2023 11:26:36 AM(UTC-4) - SUSPECT 2 to **HULING**: "How much Lms"

---

[1]　　As detailed below, I have observed the Instagram page titled "Lilbro Osama." Based upon the content and photographs of **HULING** associated with that account, it is apparent that the account belongs to **HULING**. Additionally, as also explained below, the location data and content of photographs sent to SUSPECT 2's phone by the contact "Osama" shows that the photos were taken in or around the **SUBJECT PREMISES**, which surveillance and other investigative activity described herein have shown is **HULING'S** residence.

d. 8/24/2023 12:01:46 PM(UTC-4) - **HULING** to SUSPECT 2: **HULING** sent a photograph titled, "IMG_3780.heic" to SUSPECT 2. "IMG_3780.heic" is a photograph depicting a disassembled MCD. As further described below, the countertop shown in the photograph is consistent with the bathroom countertop I observed in APD body worn camera footage taken inside the **SUBJECT PREMISES** on November 19, 2021 (see Paragraph 31). I reviewed the metadata associated with "IMG_3780.heic." Metadata is data that is embedded within some photographs that provides information on the creation of the photograph, including, but not limited to, the device used to take the photograph, the date, the time, and geolocation where the photograph was taken. The information provided in the metadata indicated that the photograph was taken on July 25, 2023, at 9:43:09 PM at coordinates 41.074213, -81.570428. These coordinates are located just south side of the **SUBJECT PREMISES**.[2] See below the photograph sent by **HULING**:

---

[2] The exact coordinates resolve to a location in the northern portion of the residence closely adjacent to the **SUBJECT PREMISES**. I am aware through training and experience that GPS coordinates in many instances may not reflect an exact location, but are accurate within a certain number of meters. Based on the context of the conversation in which this photograph was sent, other conversation between SUSPECT 2 and **HULING** on the same day the photo was taken (see Paragraph 24), the background countertop material in the photo, and the metadata location information, I believe the photo was taken inside the **SUBJECT PREMISES**.



e.  8/24/2023 12:02:25 PM(UTC-4) - SUSPECT 2 to **HULING**: "How much"

f.  8/24/2023 12:03:09 PM(UTC-4) - **HULING** to SUSPECT 2: "They 3 but if I get it fa u he ah give to me fa 250"

g.  8/24/2023 12:03:34 PM(UTC-4) _ SUSPECT 2 to **HULING**: "How many he have"

h.  8/24/2023 12:06:59 PM(UTC-4) - **HULING** to SUSPECT 2: "Last time I talked to em he had 4"

23.    On September 9, 2023, telephone number 216-612-6682 (**HULING**) sent SUSPECT 2 the following message, "2 glitches in."  It appears that this message was advertising two MCDs for sale. Listed below are some of the messages that occurred after SUSPECT 2 received the previous message:

a.  9/9/2023 12:30:05 PM(UTC-4) - SUSPECT 2 to **HULING**: "Who this"

b.  9/9/2023 12:30:17 PM(UTC-4) - **HULING** to SUSPECT 2: "Osam"

c.  9/9/2023 12:31:04 PM(UTC-4) - SUSPECT 2 to **HULING**: "No Glocks around"

d.  9/9/2023 12:31:21 PM(UTC-4) - **HULING** to SUSPECT 2: "Not rn I been tryna find sim fr"

e.  9/9/2023 12:31:56 PM(UTC-4) - SUSPECT 2 to **HULING**: "Bet what happened to the 22" (Referring to a Glock model 22 pistol).

f.  9/9/2023 12:33:01 PM(UTC-4) - **HULING** to SUSPECT 2: "I traded it for 5.7" (Referring to a Ruger model 5.7 pistol).

g.  9/10/2023 3:26:48 PM(UTC-4) - **HULING** to SUSPECT 2: "Cuz see if sb tryn trade me this 5.7 for ah Glock n sum cheese" (**HULING** is requesting SUSPECT 2 check to see if somebody would be willing to trade him a Glock pistol plus cash for the Ruger pistol).

h.  SUSPECT 2 and **HULING** then discussed trading/selling firearms.

i.  9/13/2023 11:18:02 AM(UTC-4) - **HULING** to SUSPECT 2: "U tryn trade me tht 26 for the 19x and 60" (**HULING** asked SUSPECT 2 if he wanted to trade a Glock 26 pistol for a Glock 19X pistol plus $60)

j.  **HULING** and SUSPECT 2 then appeared to make arrangements to trade Glock pistols.

k.  9/13/2023 7:32:29 PM(UTC-4) - **HULING** to SUSPECT 2: "Brotha pull up" (**HULING** advised SUSPECT 2 to come to **HULING'S** location)

l.  SUSPECT 2 then asked **HULING** for his address. **HULING** replied, "1283 nome ave" (**SUBJECT PREMISES**).

24.     I also observed three additional text messages from SUSPECT 2's cellular telephone where **HULING** provided the address to the **SUBJECT PREMISES**:

    a.  4/11/2023 8:46:20 PM(UTC-4) – "1283 nome ave" (Sent from 216-533-3829).

    b.  5/1/2023 8:48:46 PM(UTC-4) – "1283 nome ave" (Sent from 216-744-4594).

    c.  7/25/2023 6:39:30 PM(UTC-4) – "1283 nome ave" (Sent from 216-744-4594). This message was sent the same date that "IMG_3780.heic" was taken, approximately 3 hours earlier. ("IMG_3780.heic" is described in paragraph 22).

25.     On October 10, 2023, I conducted a review of **HULING**'s Instagram account "b2a.osama." During the review, I observed that the name listed on the account was "Lilbro Osama" and I observed photographs of **HULING** on the page. I also observed an Instagram story. An Instagram story is a short video, or series of videos/photographs, which users can post to their page. The video(s)/photograph(s) only remain on the page for a limited period of time before it disappears. The story consisted of multiple segments. The first segment was time stamped "1d," indicating that it was posted one day prior to me viewing it, on October 9, 2023. The segment displayed the text, "G[lock emoji] Buttons [arrow pointing at cellular telephone emoji] [arrow pointing at cellular telephone emoji]." This Instagram story segment was essentially an advertisement indicating that **HULING** had two MCDs ("Glock buttons") available and he was directing customers to contact him via his cellular telephone. See below screenshot:



26.     The fourth segment of the story depicted a photograph of the ceiling of a room (believed to be the **SUBJECT PREMISES**). The time stamp on the photograph indicated that it was posted four hours prior to me viewing it, on October 10, 2023. The caption on the photograph stated, "23 and m&p aroun [arrow pointing at cellular telephone emoji] [yellow caution sign emoji]." This Instagram story segment was an advertisement

12

indicating that **HULING** had a Glock model 23 pistol and a Smith and Wesson M&P pistol available for sale and directed customers to contact him via his cellular telephone.

27. On October 17, 2023, ATF Industry Operations Intelligence Specialist Michael Thrush conducted a query of ATF's FFL database. No record was found indicating that **HULING** is an FFL.

28. On October 17, 2023, I reviewed APD body worn camera footage from a missing person incident that occurred on November 19, 2021 (APD case 2021-00148928). During the incident, responding APD officers were allowed into the living room of the **SUBJECT PREMISES** by Candice Huling. During the incident, officers also checked the rooms of the **SUBJECT PREMISES** for the missing person. The footage of the bedroom in the southwest corner of the **SUBJECT PREMISES** depicts beige colored walls and shows a light fixture on the ceiling of the room which appears to match the photograph displayed on **HULING**'s Instagram page on October 10, 2023, which advertised a Glock model 23 pistol and a Smith and Wesson M&P pistol for sale (paragraph 26).  This indicates that **HULING** was inside the **SUBJECT PREMISES** when he advertised the firearms for sale. See below photographs comparing a screenshot of the APD footage to the screenshot of the Instagram story segment.  This indicates that **HULING** was inside of the **SUBJECT PREMISES** when he advertised the firearms for sale.  I have added red arrows to the photographs to highlight the light fixture in the southwest bedroom:





29.     On October 17, 2023, I again reviewed messages sent by **HULING (**216-744-4594)

to SUSPECT 2. During the review, I observed a series of messages sent by **HULING**

regarding **HULING** attempting to sell an AR-15 type rifle, referred to by **HULING** as a

"yop," a commonly used slang term for an assault rifle. The messages below appear to show **HULING** asking SUSPECT 2 to assist with attempting to find a buyer for the rifle:

    a.   8/13/2023 10:49:56 PM(UTC-4) – **HULING** to SUSPECT 2: "See if sb tryna grab this Yop off me $600"

    b.   8/13/2023 10:50:09 PM(UTC-4) – SUSPECT 2 to **HULING**: "Lms it"

    c.   8/13/2023 11:07:19 PM(UTC-4) - SUSPECT 2 to **HULING**: "?"

    d.   8/14/2023 8:32:04 AM(UTC-4) - **HULING** to SUSPECT 2: "Gimme one sex"

    e.   8/14/2023 8:32:08 AM(UTC-4) - **HULING** to SUSPECT 2: "Sec*"

    f.   8/14/2023 10:32:47 AM(UTC-4) - SUSPECT 2 to **HULING**: "Lms"

    g.   8/14/2023 10:32:50 AM(UTC-4) - SUSPECT 2 to **HULING**: "Lmk"

    h.   8/14/2023 10:58:53 AM(UTC-4) - **HULING** to SUSPECT 2: **HULING** sent a photograph titled, "IMG_6913.heic" to SUSPECT 2. "IMG_6913.heic" is a photograph depicting an AR-15 type rifle. I reviewed the metadata associated with "IMG_6913.heic." The information provided in the metadata indicated that the photograph was taken on August 14, 2023, at coordinates 41.074305,  -81.570481, in the northwest corner of the **SUBJECT PREMISES.**

    i.   8/14/2023 11:02:59 AM(UTC-4) - SUSPECT 2 to **HULING**: "Can you do 450?"

    j.   8/14/2023 11:07:16 AM(UTC-4) - SUSPECT 2 to **HULING**: "?"

    k.   8/14/2023 11:14:58 AM(UTC-4) - **HULING** to SUSPECT 2: **HULING** sent photographs titled "IMG_6913.heic," "IMG_6914.heic," and "IMG_6916.heic" to SUSPECT 2. Each photograph depicted an AR-15 type rifle inside of a residence (**SUBJECT PREMISES**). I reviewed the metadata associated with "IMG_6914.heic." The information provided in the metadata indicated that the

15

photograph was taken on August 14, 2023, at coordinates 41.074275, -81.570464, in the west side of the **SUBJECT PREMISES.** I also reviewed the metadata associated with "IMG_6916.heic." The information provided in the metadata indicated that the photograph was taken on August 14, 2023, at coordinates 41.074286, -81.570473, in the west side of the **SUBJECT PREMISES.**

30.     After reviewing this message thread, I compared the photographs "IMG_6913.heic," "IMG_6914.heic," and "IMG_6916.heic" to the APD body worn camera footage from November 19, 2021 (APD case 2021-00148928). The photographs sent by **HULING** appear to have been taken in the living room of the **SUBJECT PREMISES**. See below photographs comparing a screenshot of the APD footage to "IMG_6913.heic." I have added red arrows to the photographs to highlight matching features in the living room:





31.     I also observed that the countertop displayed on image "IMG_3780.heic" (depicting

the disassembled MCD detailed in paragraph 22), appeared to be similar to the countertop

in the bathroom of the **SUBJECT PREMISES**, which was seen in the APD body worn

camera footage from November 19, 2021 (APD case 2021-00148928). This is consistent

with the location of the bathroom on the south side of the **SUBJECT PREMISES**
compared to the metadata location information for "IMG_3780.heic."

32.     On October 18, 2023, I conducted surveillance on the **SUBJECT PREMISES**. At
approximately 11:26 AM, **HULING** exited the north facing entry door of the **SUBJECT
PREMISES** and stood in the driveway.

33.     I am also aware of an incident that occurred on February 8, 2023, involving
**HULING** (APD case 2023-00015234). On that date, information was obtained by an
employee at Butchel Community Learning Center (1040 Copley Road, Akron, Ohio,
44320) that **HULING**, who was a student at the school, may be in possession of a firearm.
**HULING** was overheard speaking with another student at the school and asking the other
student, "Is your glove box unlocked is it still in there?" While school staff attempted to
locate the vehicle, referred to by **HULING**, in the parking lot, **HULING** exited the school.
A school resource officer (SRO) then observed **HULING** near the vehicle that was being
sought after. **HULING** appeared to be attempting to gain entry into the vehicle and locked
the vehicle, using keys, while interacting with an SRO. **HULING** then left the area on foot.
A subsequent search of the vehicle yielded a Glock model 20 pistol equipped with an MCD
and an extended magazine. Forensic testing by the Ohio Bureau of Criminal Investigation
determined that **HULING**'s Deoxyribonucleic acid (DNA) was present on the back of the
firearm slide (where the MCD is located).

34.     **HULING** was charged with Unlawful Possession of a Dangerous Ordinance,
Illegal Conveyance of Weapons on School Premises, and Improperly Handling Firearms in
a Motor Vehicle. Akron Public School administration provided APD with the address that
they had on file for **HULING**, which was the **SUBJECT PREMISES.** This case is
currently pending in the Summit County, Ohio, Court of Common Pleas.

18

## STATEMENT OF EXPERTISE

35.    Based on my training and experience, and the collective training and experience of others with whom I work, I know the following to be true:

a. Subjects possessing firearms and/or MCDs, in particular subjects engaged in the violation of other laws, such as unlawful dealing in firearms, often possess firearms for protection. In order for a subject to protect themselves, they must have ready access to the firearm they are possessing. I have regularly encountered subjects that are possessing firearms in the same residence where they reside, in addition to subjects possessing firearms in their vehicles and other storage locations to which they have ready access.

b. Subjects illegally possessing firearms and/or MCDs, will attempt to hide their firearms and/or MCDs, as their mere possession of those items is a violation of Federal law. I am familiar with a variety of places that people have attempted to conceal their illegally possessed firearms and/or MCDs, to include vehicles in their names, vehicles in the names of significant others or associates, rental vehicles, in small ceiling and wall compartments, in garages, in safes, and in a variety of storage containers found both inside and outside of a residence.

c. Subjects possessing firearms and/or MCDs, also regularly possess ammunition for those firearms, ammunition magazines, firearms maintenance paraphernalia, like a weapons cleaning kit, and bags or holsters to either carry or conceal firearms.

d. Subjects unlawfully dealing in firearms, including MCDs, often have record or evidence of how they obtained a firearm and/MCD, and who the firearm and/MCD was unlawfully sold to. In cases where a firearm was "straw

19

purchased," which occurs when a subject that does not have a criminal history purchases a firearm on behalf of a subject that does have a criminal history, this record may actually be a copy of the record of sale. Other record may include be in the form of business and personal ledgers and diaries, in a photograph of a subject handling, firing, or possessing firearms and/or MCDs, calendars documenting dates violations of law have occurred, "IOUs," miscellaneous notes, and documents when firearms and/or MCDs were obtained, transferred, sold, distributed, and/or concealed. These records may be financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale and/or illegal possession or transfer of firearms and/or MCDs. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators. In other cases, I have observed firearms boxes, which contain the serial number for a firearm, stored separately from the location of the firearm, or in residences where no firearms were recovered at all. The box containing the serial number of a firearm offers clues as to the possession of a firearm by subjects at the residence and how those subjects came to possess the firearms.

e.  In addition, most all of the of the above listed documents and records may be stored electronically on an electronic device, such as a cellular telephone. Cellular telephones offer a broad range of including, but not limited to the following: storing names and phone numbers in electronic "address books;" storing voicemails; storing a "call log" which records the telephone number, date, and time of calls made to and from the telephone; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and video; storing notes and electronic messages; storing and playing back audio files; storing dates and appointments; accessing and downloading information from the internet; and allowing the operation of web-based communication and social media applications, such as Facebook, Instagram, Twitter, and Snapchat.  Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device. Similarly, any electronic device, including computers, ipads, ipods, tablets, and electronic organizers, capable of communicating over the internet, have the potential to provide the evidentiary value described above.

f.  Subjects maintain documents and other items showing who owns, occupies, or controls the location being searched, which is evidence of who is responsible for or has knowledge about the items found on the premises, including contraband and other seized evidence. Documents and items showing the identity of the persons owning, residing in, or controlling an area being searched may include, but are not limited to, utility and telephone bills, payment records and correspondence, tax returns, keys, deeds, rental payment receipts, and mortgage receipts.

36.  The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their

21

users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

22

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel

23

encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of **Jordan Amiere HULING**, to the fingerprint scanner of the device; (2) hold the device in front of **HULING'S** face and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

24

**CONCLUSION**

37.     Based on the information set forth in this affidavit, including my training and experience, I believe there is probable cause to believe evidence of violations of the following offenses are currently located on **HULING** and in the **SUBJECT PREMISES:**

      a.   Unlawful possession of a machinegun, in violation of 18 U.S.C. § 922(o).

      b.   Unlawful dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A).

38.     Due to the ongoing nature of this investigation, I respectfully request that all documents related to this application for search warrant be sealed until further order of the Court.  This investigation is of a sensitive nature, and any disclosure of the fact of this search warrant, or the facts contained in this affidavit, could jeopardize the investigation by allowing subjects to conceal and/or destroy evidence, and could potentially place Confidential Sources of Information and/or law enforcement at risk.

39.     I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge, information, and belief.

_____
John S. Christie Jr.
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and
Explosives


This affidavit was sworn to by the affiant by telephone after a PDF was transmitted
by email, per Crim R. 41(d)(3) this __25th___ day of October 2023.

_____
Amanda M. Knapp
United States Magistrate Judge
Northern District of Ohio
Eastern Division

25